### Michael L. MARTINELLI

v.

### Frank L. HOPKINS, Jr., et al.

### No. 99–540–Appeal.

Supreme Court of Rhode Island.

Dec. 18, 2001.

---

Brian Cunha, Fall River, MA, for plaintiff.

Kathleen M. Powers, Paul E. Phillips, John Glasson, Rebecca T. Partington, Marc DeSisto, Providence, for defendant.

Present: LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In this civil negligence action, a Superior Court trial jury returned a verdict for $2 million in favor of the plaintiff, Michael L. Martinelli (Martinelli or the plaintiff), and against the defendants, Frank L. Hopkins, Jr., Showtime Security and the Town of Burrillville (the defendants). Only the cross-appeals of the plaintiff and the Town of Burrillville (the town) are now before us.[1] In those appeals, we are called upon to determine whether the trial justice erred in denying the town's trial and post-trial motions for judgment as a matter of law; its motion for a new trial; and whether he erred in his application of G.L.1956 § 9–31–3 of the Governmental Tort Liability Act by limiting the town's liability to Martinelli at $100,000 without interest.

## I

### Facts/Procedural History

On August 22, 1992, at approximately 12:20 a.m., the plaintiff was severely injured while on property owned by Frank L. Hopkins, Jr. (Hopkins), when a rotted tree fell upon him. At the time, he was attending Hopkins's thirteenth annual outdoor party, known as the "Patoad Festival" (the festival), with approximately 4,000 other partygoers. As a result of his

---

1. Before the trial, Showtime Security settled with the plaintiff. Subsequently, Frank L. Hopkins, Jr. was adjudicated as bankrupt and his liability to Martinelli was discharged.

injuries, the plaintiff was rendered a paraplegic and he later commenced this negligence action against the defendants to recover for his damages.

Hopkins's five-acre undeveloped property where the festival was held is in the village of Harrisville in the Town of Burrillville.[2] Hopkins had conducted his first outdoor festival there in 1979, attracting approximately 175 people, who paid a moderate entrance fee. Once inside, the participants could indulge themselves with unlimited quantities of beer and sandwiches while jubilantly exulting to the loud music provided by several rock-and-roll bands. The unlimited beer, food and loud music proved to be a good drawing card for Hopkins' festival and, as news of the festival spread, so did the size of the crowds that it attracted.

In 1986, when Hopkins applied to the Burrillville Town Council for his annual festival entertainment license, he encountered, for the first time, a complaining group of neighbors joined by the town's chief of police, Walter Lees (Chief Lees). They complained about the large crowds, the ever increasing parking and traffic hazards, the noise, and the petty vandalism caused by the unruly crowds attending the festival. The town council lent a receptive ear to their complaints and denied Hopkins's request for the festival's entertainment license. A Superior Court justice, however, lent a more sympathetic ear to Hopkins's request for mandatory injunctive relief and ordered the town council to issue Hopkins an entertainment license for his 1986 festival.

In 1990, the Burrillville Town Council, aware that in 1988 more than 500 people had attended the festival and had left behind a deluge of neighborhood complaints, imposed conditions upon the granting of Hopkins's 1990 festival license. It required that:

"1. A private security firm be hired by [Hopkins] at his expense for parking and security reasons and with approval of Police Chief Wallace F. Lees.

"2. That the music is shut down at 12:00 P.M. [sic] Midnight.

"3. That an adequate number of Port-a–Johns be rented to handle the amount of people attending.

"4. That [Hopkins] be responsible for the cost for any call in of off-duty police officers deemed necessary by the Chief of Police as a substitute for assigned detail officers."

That year, almost 1,200 people attended the event.

By 1991, festival attendance had swelled to around 2,000 and, in anticipation of his 1992 festival, Hopkins ordered 4,000 tickets to be printed. He, and some friends, then cleared almost two acres on his festival grounds to accommodate the expected large turnout, and erected plastic snow fences around the perimeter of the cleared area by attaching the fences to "bang pipes" and numerous trees surrounding the cleared area.

However, it appears that to keep his port-a-john and security costs down, Hopkins grossly underestimated the beer retention capabilities of his anticipated festival attendees and misrepresented their expected number. Thus, despite ordering 31,000 gallons of beer to be freely avail-

---

**2.** Burrillville is made up of six villages; namely, Glendale, Harrisville, Mapleville, Nasonville, Oakland and Pascoag. At the time, each village was served by its own fire district, but shared a central police dispatch system.

able for consumption by his expected 4,000 ticket holders, Hopkins elected to lease only 50 port-a-johns to accommodate the festival's beer drinkers. Making matters worse, he engaged Showtime Security (Showtime) to provide needed security personnel to control the expected festival attendees, but told David Luongo (Luongo), Showtime's president, that only 2,000 to 2,500 people were expected to attend. As a result, Luongo decided that only thirty-eight security workers would be required to safely secure the festival.

The record reveals that on previous festival occasions, Chief Lees had assigned only three police officers to assist him in handling routine police duty outside the festival grounds. However, for the August 22, 1992 festival, he decided to assign four additional officers to direct traffic and parking on the streets leading to the festival grounds and to control the incoming and outgoing festival attendees. That evening the festival grounds quickly filled and became overcrowded, with attendance swelling to approximately 4,500 festival revelers.[3]

At the festival that evening, free-flowing beer was served to the partygoers in mugs and steins, as well as in one-gallon, five-gallon and quart-sized containers. Soon, numerous people were intoxicated and became unruly and out of control. It was not long before long lines of people began queuing at the port-a-johns. However, many others, unwilling or unable to wait their turn to use the inadequate port-a-johns, decided that the wooded areas beyond the plastic fence would prove more accessible to their needs. Consequently, a steady stream of people began stepping over and pushing down the plastic snow fences to gain access to the adjoining woodlands, where the peace and solitude of its plush foliage would be interrupted only by the recurrent gentle sibilant sounds of previously consumed beer.

Meanwhile, although Chief Lees had become aware that many in the crowd were intoxicated and out of control, unfortunately he made no attempt to close down the festival before its scheduled midnight closure time. As reason for this failure, he cited his fear that any attempt by his seven police officers to do so could create a riot and imperil the safety of those police officers. Indeed, despite the fact that a condition imposed upon the entertainment license was that the music had to end precisely at midnight, Chief Lees permitted the band to continue playing for an additional fifteen minutes after the midnight deadline. Notwithstanding, at 12:30 a.m., the band was still playing for the unruly festivalgoers, and it was not until then that Chief Lees threatened to confiscate the band's equipment if it did not stop playing. It did.

In the meantime, however, between 12 and 12:20 a.m., while the Patoad festivities continued to rage, five or six rowdy and unruly revelers staggered by the plaintiff as he was seated five to ten feet in front of one of the plastic perimeter fences. The revelers were pushing and shoving each other toward the wooded area beyond the plastic fence and, as they did, a rotted tree toppled and fell upon the plaintiff. It appears that the plastic fence over which the revelers had crossed, and which apparently had been attached to the rotted tree for support, could not carry the revelers'

---

**3.** At trial, both Luongo and one of the town's police officers testified that they realized that the event had become overcrowded between 8 and 9 p.m. Chief Lees testified that he first observed the festival to be noticeably overcrowded between 11 and 11:30 p.m.

weight and, apparently, pulled down the tree.

Within seconds of the incident, a Showtime security guard arrived and removed the rotted tree from on top of the plaintiff. Minutes later, Chief Lees was notified and he ordered two police officers to enter the property and to investigate the reported accident. One of the officers returned and advised Chief Lees that someone had been injured. Chief Lees then immediately went to the scene. Upon observing the severity of the plaintiff's injuries, Chief Lees quickly called the police station dispatcher and requested rescue personnel from the village of Glendale to respond.[4] The plaintiff was taken to and treated at Rhode Island Hospital and subsequently was released. He later commenced this action against Hopkins, Showtime and the town.

Before trial, the town moved for partial summary judgment, contending that the $100,000 statutory cap provided by § 9–31–3 was applicable. At first, the plaintiff's counsel objected to the town's motion, but he later withdrew his objection. Subsequently, by agreement of counsel for all parties, a consent order was entered granting the town's motion for partial summary judgment, and the town's liability was capped pursuant to § 9–31–3.

After a trial on the merits, a Superior Court jury returned a verdict in favor of the plaintiff and against all three defendants, Hopkins, Showtime and the Town of Burrillville. It awarded the plaintiff $2 million for his injuries and damages and determined the comparative negligence of Hopkins, Showtime and the town to be 60

percent, 20 percent, and 20 percent, respectively.

Finding that the town was acting in a clear governmental function when it issued the entertainment license to Hopkins, the trial justice found that the town's conduct under the circumstances was egregious, thus precluding it from seeking refuge from its liability to the plaintiff under the public duty doctrine. Consequently, and in accordance with the agreed-upon partial summary judgment order that previously had been entered, the trial justice limited the plaintiff's recovery from the town to $100,000, without interest, pursuant to § 9–31–3.

After trial, Hopkins and the town renewed their motions for judgment as a matter of law, asserting that the plaintiff failed to show that their actions were the proximate cause of his injuries. In the alternative, they each filed motions for a new trial.

Meanwhile, the plaintiff filed a post-trial motion seeking relief from the partial summary judgment earlier consented to by counsel for the parties. Specifically, he sought relief from imposition of the statutory cap on the town's liability for damages. He asserted that the town's police detail at the festival was not acting in a governmental function but, instead, in a private proprietary function that could and was being carried on by private parties, and contended that in doing so, the police had acted in a negligent manner. The trial justice denied all of the motions. The plaintiff and the town then filed cross-appeals with this Court.

For the reasons hereinafter set forth, we deny the cross-appeals and affirm the

---

4. Although the property was in the village of Harrisville, Chief Lees requested Glendale rescue to respond because he knew that the access road from Harrisville had been blocked since approximately 9 p.m. by parked cars belonging to festival participants.

judgment. Additional facts will be supplied as required for our legal analysis.

## II

### Standards of Review

The town contends that the trial justice erred in denying its motion for judgment as a matter of law and its motion for a new trial.

### (i) Judgment as a Matter of Law

■ " 'The standard for granting a motion for judgment as a matter of law is the same as that applicable to its precursor, a motion for a directed verdict.' " *Raimbeault v. Takeuchi Manufacturing (U.S.), Ltd.*, 772 A.2d 1056, 1062 (R.I.2001). In considering such a motion, the trial justice examines:

> " 'the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draws from the record all reasonable inferences that support the position of the nonmoving party. *** If, after such a review, there remain factual issues upon which reasonable persons might draw different conclusions, the motion for [judgment as a matter of law] must be denied, and the issues must be submitted to the jury for determination.' " *Id.* at 1062–63 (quoting *Mellor v. O'Connor*, 712 A.2d 375, 377 (R.I.1998)).

"If, on the other hand, no relevant issues of fact exist and defendant is entitled to judgment as a matter of law, then the trial justice should grant the motion and dismiss the complaint." *Swerdlick v. Koch*, 721 A.2d 849, 856 (R.I.1998). "In reviewing a trial justice's decision on a motion for judgment as a matter of law, this Court 'is bound by the same rules and [standards] as the trial justice.' " *Raimbeault*, 772 A.2d at 1063 (quoting *Mellor*, 712 A.2d at 377).

We have reviewed the record evidence in the light most favorable to the plaintiff, and we have drawn all reasonable inferences that can support the plaintiff's position. Having done so, we conclude that reasonable minds could, and did, differ. Consequently, we are satisfied that the trial justice did not err in denying town's motion for judgment as a matter of law.

### (ii) Motion for a New Trial

■ The standard for our review of the grant or denial of a motion for a new trial is well settled. *See Dilone v. Anchor Glass Container Corp.*, 755 A.2d 818, 821 (R.I.2000). The trial justice must review the trial evidence and exercise his or her independent judgment in passing upon the weight of the evidence and the credibility of the witnesses. *See id.* In doing so,

> "a trial justice sits as the super [seventh] juror and is required to independently weigh, evaluate, and assess the credibility of the trial witnesses and evidence. If the trial justice determines that the evidence is evenly balanced or is such that reasonable minds, in considering that same evidence, could come to different conclusions, then the trial justice should allow the verdict to stand. *** When this Court reviews a trial justice's decision on a motion for a new trial, his or her decision will be accorded great weight and will be disturbed only if it can be shown that the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." *Graff v. Motta*, 748 A.2d 249, 255 (R.I.2000) (quoting *Morrocco v. Piccardi*, 713 A.2d 250, 253 (R.I. 1998) (per curiam)).

After reviewing the evidence before him and passing upon its weight and the weight and credibility of the trial witnesses, the trial justice clearly exercised his independent judgment thereon and denied the town's motion for a new trial. He found that the town although acting in a governmental function when it issued the entertainment license, nonetheless, had acted in an egregious manner. From our review of the record and for the reasons set forth herein, we are unable to discern any sufficient reason causing us to disagree with the trial justice's conclusion.

## III

### Analysis

In his appeal, the plaintiff requests this Court to abolish the public duty doctrine. He asserts that it is a judge-made doctrine that improperly resurrects the doctrine of sovereign immunity, a doctrine that the legislature clearly intended to abrogate when it enacted General Laws 1956 chapter 31 of title 9, entitled the Governmental Tort Liability Act.

Alternatively, the plaintiff contends that the public duty doctrine does not apply to the facts of this case because the duties of the town police mirrored those of the private security guards employed by Hopkins, and that those officers negligently performed their duties. He next contends that the two exceptions to the public duty doctrine are applicable in this case. To

support that contention, he first asserts that he was a member of an identifiable class of persons to whom the town owed a duty of care. He next avers that the town acted egregiously when it granted the entertainment license to Hopkins, despite knowing about the festival's previous unruly crowds.

In its cross-appeal, the town contends that its actions are protected by the public duty doctrine and that the trial justice erred in finding the egregious conduct exception to be applicable. In addition, it asserts that even if an exception to the doctrine does apply, the evidence adduced at trial fails to support any finding that the town's actions proximately caused the plaintiff's injuries.

## IV

### The Public Duty Doctrine

Although the plaintiff has made a compelling argument to support the abolition of the public duty doctrine, and while the doctrine verges on the brink of being a legal enigma because of its many exceptions, we do not believe that it is appropriate to address that issue at this time. The record reveals that the plaintiff's counsel actually stipulated to the imposition of the statutory cap as provided by § 9–31–3.[5] Thus, even if we were to consider abolishing the doctrine or to conclude that the police officers in this case were acting in a proprietary function,[6] because of the stipu-

---

**5.** Section 9–31–3 provides:

"In any tort action against any city or town ***, any damages recovered therein shall not exceed the sum of one hundred thousand dollars ($100,000); provided, however, that in all instances in which the city or town *** was engaged in a proprietary function in the commission of the tort, the

limitation of damages set forth in this section shall not apply."

**6.** If we were to conclude that the police officers were negligent while acting in a proprietary function then, but for the stipulated agreement, the plaintiff would have been entitled to receive the full damage award assessed against the town by the jury. However, in

lated agreement between the parties, the plaintiff's recovery had been limited to $100,000 in damages from the town. Consequently, we will concern ourselves only with the question of whether the trial justice erred in finding that the egregious conduct exception to the public duty doctrine applied to the actions of the town and its police officers.

### (i) The Egregious Conduct Exception

The town asserts that the trial justice erred in applying the public duty doctrine's egregious conduct exception to the facts of this case. The plaintiff counters that even if the trial justice did so err, nevertheless, the special duty exception to the public duty doctrine likewise is applicable. Because we conclude that the trial justice did not err in applying the egregious conduct exception in this case, we need not address the plaintiff's special duty rule contentions.

■ "When the state engages in an activity that a private individual typically would not perform, such as the maintenance of state highways or the issuance of state drivers' licenses, the public duty doctrine will shield the state from liability." *Longtin v. D'Ambra Construction Co.,* 588 A.2d 1044, 1046 (R.I.1991). *See also Knudsen v. Hall,* 490 A.2d 976, 978 (R.I. 1985); *Ryan v. State, Department of Transportation,* 420 A.2d 841, 843 (R.I. 1980). Like the issuance of a state driver's license by the state, the issuance of the entertainment license by the town council in this case was an activity that a private individual typically would not, and could not, perform. *See* G.L.1956 § 5–22–

1. Consequently, we conclude that the trial justice did not err in his finding that the town was engaged in a governmental function when it issued the 1992 entertainment license to Hopkins. However, our analysis does not end here.

■ "The underlying purpose of the public-duty doctrine 'is to encourage the effective administration of governmental operations by removing the threat of potential litigation.'" *Misurelli v. State, Department of Transportation,* 590 A.2d 877, 878 (R.I.1991) (quoting *Catone v. Medberry,* 555 A.2d 328, 333 (R.I.1989)). This is achieved by "shield[ing] the state and its political subdivisions from tort liability arising out of discretionary governmental actions ***." *Schultz v. Foster–Glocester Regional School District,* 755 A.2d 153, 155 (R.I.2000) (quoting *Haley v. Town of Lincoln,* 611 A.2d 845, 849 (R.I.1992)).

■ The "immunity enjoyed by state and municipal governments is applicable to governmental functions, except in three situations: '(1) when the governmental entity owes a "special duty" to the plaintiff, (2) when the alleged act or omission on the part of the governmental entity was egregious, or (3) when the governmental entity engaged in activities normally undertaken by private individuals or corporations.'" *Schultz,* 755 A.2d at 155 (quoting *Kuzniar v. Keach,* 709 A.2d 1050, 1053 (R.I.1998)). Thus, it is "[o]nly after a determination that the activity at issue 'could not ordinarily be performed by a private person' does the public-duty doctrine and its two exceptions—the special-duty exception and the egregious-conduct exception—become considerations.'" *Houle v. Galloway*

light of *State v. Botelho,* 459 A.2d 947, 949 (R.I.1983), we have our doubts that the police officers in this case acted in anything other than a governmental function and, for purposes of our analysis, we will proceed upon that assumption.

*School Lines, Inc.*, 643 A.2d 822, 825–26 (R.I.1994) (quoting *Haley v. Town of Lincoln*, 611 A.2d 845, 849 (R.I.1992)).

██ With respect to the egregious conduct exception, "the public-duty doctrine will not shield a municipality that has engaged in 'egregious conduct' where it 'has knowledge that it has created a circumstance that forces an individual into a position of peril and subsequently chooses not to remedy the situation.'" *Kashmanian v. Rongione*, 712 A.2d 865, 867 (R.I.1998) (quoting *Houle*, 643 A.2d at 826).

The record in this case reveals that Hopkins held his first annual "Patoad Festival" in 1979. Approximately 175 people attended that event. In the beginning, its popularity grew gradually; thereafter, its attendance rapidly increased each year. In 1988, up to 500 people attended. By 1990, it had increased to almost 1,200 people. The following year, there were approximately 2,000 participants. Coinciding with this rapid increase in attendance was a rapid increase in associated problems such as the obstruction of public highways, noise, petty vandalism, public intoxication and disorderly rowdiness.

When, in 1990, Hopkins applied for his festival entertainment license, Chief Lees objected to its issuance by the town council, and informed the council that each year the festival's associated problems had escalated. He testified that he knew Hopkins was dispensing free beer and that he had told the town council that he was sick of "baby-sitting a beer party." In as early as 1988, the council had, in fact, been informed about the free beer.

██ After reviewing all the evidence presented during trial, the trial justice determined that by granting the 1992 festival license to Hopkins, the town's conduct was egregious. He found that:

> "The Town failed to exercise any care either to inspect, through Town officials or by their licensing body, the premises in which they were going to permit an entertainer to assemble an indefinite sized crowd."

He noted that this failure to inspect occurred in spite of the fact that:

> "The Town was on abundant notice that the festival was an extraordinary event. The Town was on abundant notice that this operation operator, Frank Hopkins, intended to bring a large number of people into a limited area. They were on notice that he was going to supply those people with drink. They were on notice that these spectators at this event could and would become unruly and disorganized. They were on abundant notice that unruliness and disorderliness of crowds collected by Frank L. Hopkins presented certain risks to the neighborhood. [Nonetheless], the Town closed its eyes to the risk and hazard that would be presented to the spectators themselves."

In light of these observations, the trial justice concluded that:

> "The Town knew or should have known, in this Court's estimate, that this Patoad fest was a dangerous activity. The slightest kind of inquiry. at the licensing hearing as to how many people this licensee proposed to gather at this event, how much alcohol he intended to make available to the number of people he had *** what his plans for controlling a rule of order in and around his festival, were dozens of questions that undoubtedly should have arisen about this kind of extraordinary event."

***

"Taken all together, the totality of these events satisfies the Court that the Town in all of its activity with respect to this event breached its duty of care in an egregious fashion. In effect, the Town 'forced' [the plaintiff], once he decided to go to the licensed event, to be exposed to the hazards of serious injury that they should have known about and could have prevented had they taken timely activity to have prevented the hazard."

In view of the evidence before him, and mindful of the standards for our review of a trial justice's grant or denial of either a motion for judgment as a matter of law or for a new trial, we cannot say that the trial justice in this case erred in denying the town's motions challenging his interpretation of the public duty doctrine rule.

### (ii) Proximate Cause

■ The town additionally asserts that even if it was negligent, the evidence presented at trial failed to demonstrate that its negligence, if any, was the proximate cause of the plaintiff's injuries. Accordingly, it contends that the trial justice erred in denying its motions for judgment as a matter of law and for a new trial on this issue.

■ The town correctly avers that " 'the mere occurrence of an accident, without more, does not warrant an inference that a defendant has been negligent.' " *McLaughlin v. Moura*, 754 A.2d 95, 98 (R.I.2000). However, as we stated in *Skaling v. Aetna Insurance Co.*, 742 A.2d 282, 288 (R.I.1999), "[i]n most cases, proximate cause is established by showing that but for the negligence of the tortfeasor, injury to the plaintiff would not have occurred." Although we agree with the

town's general contention that "the causal connection between negligence and a plaintiff's injury must be established by competent evidence and may not be based on conjecture or speculation[,]" we are also mindful that "negligence and proximate cause can be established by circumstantial evidence, and specific direct evidence of negligence and proximate cause is not always necessary." *Kurczy v. St. Joseph Veterans Association, Inc.*, 713 A.2d 766, 771 (R.I.1998). We have stated previously that " '[c]ausation is proved by inference' and, although '[p]roof by inference need not exclude every other possible cause, *** it must be based on reasonable inferences drawn from the facts in evidence.' " *McLaughlin*, 754 A.2d at 98 (quoting *Skaling*, 742 A.2d at 288).

Our review of the record reveals that the town knew or should have known of the dangers that would be imposed upon the event's spectators by a very large, intoxicated and unruly group of party-goers. In spite of this, the town failed even to inquire about whether Hopkins intended to provide huge quantities of beer, as he had done in the past, and whether Hopkins's plans would provide adequate sanitation facilities and sufficient private security guards to patrol the event.

The record also reveals that the toilet facilities were woefully inadequate for the huge crowd that attended the festival on August 22, 1992, and that by 8 p.m., at least one police officer was aware that the event was overcrowded. In addition, Chief Lees also was aware that the event actually had gotten out of hand on or before 11:30 p.m. Nevertheless, despite the fact that he had clear authority to immediately shut down the event, he actually extended it for an additional fifteen minutes beyond its scheduled closing deadline time. In-

deed, he made no attempt to shut down the festival before 12:30 a.m., thirty minutes after the festival closing deadline and one whole hour after he became aware that it was out of control. It also appears that the plaintiff was injured during that fateful one-hour period. Based upon this record, the jury properly found, and the trial justice agreed, that the town's negligence proximately served to cause the plaintiff's injuries.

■ Given the vast quantity of beer that was made available for consumption, coupled with the woeful lack of toilet facilities, we agree with the trial justice's conclusions that it was reasonably foreseeable that festival attendees would seek alternative toilet arrangements in the nearby woods, and that a mere snow fence would not prevent them from achieving their objectives. As a result of that foreseeable consequence, several intoxicated participants did breach a portion of the plastic snow fence that apparently had been fastened to a rotted tree and apparently caused the tree to fall and injure the plaintiff. Consequently, a reasonable inference could be drawn that the town's negligent issuance of the license, coupled with the later failure of its police chief and police officers to control the event once they became aware that it was out of hand, proximately caused the plaintiff's injuries. It should be noted that the plaintiff was not required to prove that the town's negligence was *the* proximate cause for his injuries and damages, but only that it was *a* proximate cause which, standing alone, or in combination with any other defendant's negligence, contributed to the plaintiff's injuries. *See McLaughlin,* 754 A.2d at 98.

We conclude that the trial justice did not err in finding that reasonable minds could differ about what could proximately have caused the plaintiff's injuries; consequently, he did not err when he denied the town's motions for judgment as a matter of law and for a new trial on this issue.

Accordingly, and for the foregoing reasons, the parties' cross-appeals are denied and dismissed, and the final judgment is affirmed. The case papers are to be returned to the Superior Court.

Chief Justice WILLIAMS did not participate.