Eileen LaBELLA et al.

v.

David R. ORTIZ et al.

No. 2003–157–Appeal.

Supreme Court of Rhode Island.

March 5, 2004.

Michael Kiselca, for Plaintiffs.

Patrick T. Conley, Jr., Providence, for Defendants.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

PER CURIAM.

The plaintiffs, Eileen and James LaBella, individually and as parents and natural guardians of their minor children, Kyle and Katlyn, brought this civil action against the defendants, David R. Ortiz and his grandfather, Jesus I. Ortiz, alleging that David's negligence caused a motor vehicle accident that resulted in personal injury. After a jury verdict in favor of the defendants, the trial justice granted the plaintiffs' motion for a new trial. The defendants appeal the trial justice's decision. The plaintiffs have filed a cross-appeal from the same ruling, claiming that the trial justice erred in failing to grant their new-trial motion based upon incorrect jury instructions. This case came before the Court for oral argument

on January 27, 2004, pursuant to an order directing all parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After considering the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and, therefore, we proceed to decide the case at this time. For the reasons stated below, we affirm the trial justice's decision to grant a new trial.

On Saturday, December 7, 1996, David R. Ortiz (Ortiz) was operating his grandfather's car when it struck the rear bumper of a pickup truck operated by Eileen La-Bella (LaBella). Two of LaBella's children, Kyle, who was six years old, and Katlyn, four years old, were riding with their mother at the time. According to LaBella, she first brought her vehicle to a complete stop at the intersection of New London Avenue and Providence Street in West Warwick. She described at trial how New London Avenue slopes down and intersects with Providence Street at a forty-five degree angle. Because of the configuration of this intersection, she had to bring her vehicle forward about a foot and turn her head completely to the left side to check for oncoming traffic. LaBella testified that although she had inched forward to get a better view, she did not drive her truck into the intersection.

According to Ortiz, he had been a few feet directly behind the LaBella vehicle when it came to a stop at the intersection. As LaBella inched her truck forward, he, too, inched his car forward, so that the distance between the two vehicles remained about the same. He then looked left to check for oncoming traffic. Not seeing any traffic, and believing that La-Bella's truck had already gone through the intersection, he took his foot off the brake to get to the stop sign. Ortiz testified that even before he was able to turn his head forward again, his car "bumped" the rear of the truck.

The fact that Ortiz negligently operated his vehicle is not disputed. However, the parties do dispute the extent of the impact and resulting injuries. While Ortiz claims only to have "bumped" LaBella's vehicle, LaBella contends that the force of the impact pushed her truck "several feet beyond where [she] was." Immediately after the accident, they drove their vehicles to a nearby gas station to telephone the police. At that time, Ortiz saw no damage to LaBella's truck, while his grandfather's car sustained a bent license plate and a paint streak. LaBella, on the other hand, testified that the impact caused the right side of her truck's rear bumper to be "pushed under the bed." Ortiz testified that photographs of LaBella's truck purportedly taken after the accident, and admitted in evidence at trial, did not depict the truck as it appeared to him at the gas station.

LaBella testified that on the Monday following the accident, she began experiencing headaches and neck pain. She went to Harvard Pilgrim Health Care (Harvard Health) and was instructed to take over-the-counter pain medication. Her pain, however, persisted. She also noticed that her daughter Katlyn could not move her neck very well. On the Thursday after the accident, LaBella scheduled an appointment for both herself and Katlyn to see Dr. Kerry Kasegian, a chiropractic physician, that same day. Doctor Kasegian obtained a medical history from LaBella and conducted a physical examination. She determined that LaBella's range of motion was diminished, that she had some muscle spasm, and that she was suffering from an acute cervical and thoracic sprain/strain, which she attributed to the motor vehicle collision with Ortiz. Doctor

Kasegian's overall treatment of LaBella lasted from December 1996 until August 1997.

With respect to Katlyn, Dr. Kasegian found that she had a decreased range of motion, as well as muscle spasm in her neck and diagnosed her with cervical sprain/strain, which she also related to the collision. She treated Katlyn from December 1996 to April 1997. LaBella also made an appointment for her son Kyle to see Dr. Kasegian on the Friday following the accident "to make sure that he had no damage as well." Doctor Kasegian diagnosed Kyle with an acute cervical sprain/strain, which she traced to the accident. Her treatment of Kyle lasted from December 1996 to March 1997.

On August 5, 1998, plaintiffs filed a negligence action against defendants. A jury trial was conducted between November 12 and 14, 2002. The defendants conceded negligence but contested whether that negligence was the proximate cause of plaintiffs' injuries. The jury returned a verdict in favor of defendants, having found that plaintiffs failed to prove by a fair preponderance of the evidence that the injuries they sustained were proximately caused by Ortiz's negligence. On November 22, 2002, plaintiffs filed a motion for a new trial, arguing that the verdict failed to respond to the evidence and that the trial justice erred in refusing to charge the jury that they may return a verdict for plaintiffs if they find that Ortiz's negligence aggravated a prior injury that LaBella had experienced. On January 24, 2003, the trial justice heard arguments on plaintiffs' motion and decided at that time to grant a new trial, but he did not address the latter argument regarding an instruction on aggravation of a preexisting medical condition. On February 11, 2003, defendants filed a notice of appeal to this Court. On February 19, 2003, the plaintiffs filed a cross-appeal, arguing that the trial justice should have instructed the jury on the issue of aggravation. Additional facts will be supplied as needed to discuss the issues raised on appeal.

When ruling on a motion for a new trial, the trial justice acts as a "super-juror." *Franco v. Latina*, 840 A.2d 1110, 1111 (R.I.2004) (citing *English v. Green*, 787 A.2d 1146, 1149 (R.I.2001)). "In carrying out this function, the trial justice should review the evidence and exercise his or her independent judgment 'in passing upon the weight of the evidence and the credibility of the witnesses.'" *Id.* (quoting *Martinelli v. Hopkins*, 787 A.2d 1158, 1165 (R.I.2001)). The trial justice should allow the verdict to stand if he or she "determines that the evidence is evenly balanced or is such that reasonable minds, in considering that same evidence, could come to different conclusions." *Id.* (quoting *Martinelli*, 787 A.2d at 1165). However, the trial justice should grant the motion if he or she "determines that the verdict is against the preponderance of the evidence and fails to do justice to the parties or to respond to the merits of the controversy." *Id.* at 1112 (citing *Perkins v. City of Providence*, 782 A.2d 655, 656 (R.I.2001) (per curiam)). On appeal, this Court will first determine whether the trial justice's decision reveals that he or she has performed this function in accordance with the proper standard. *Id.* at 1112 (citing *English*, 787 A.2d at 1149). If so, "we will not disturb a trial justice's decision either granting or denying a new-trial motion unless the trial justice overlooked or misconceived the evidence or otherwise was clearly wrong." *Id.* (citing *English*, 787 A.2d at 1149).

The defendants have articulated a number of contentious points in their appeal. Although these issues are many, they all essentially relate to either (1) the trial

justice's failure to consider the inconsistencies in, and impeachment of, Dr. Kasegian's testimony or (2) the trial justice's overlooking and misconceiving other material evidence.[1]

■ According to defendants, the trial justice failed to consider that Dr. Kasegian did not take a complete and accurate history from LaBella. The defendants refer specifically to Dr. Kasegian's testimony that LaBella's left shoulder was higher than the right and that, in her opinion, that condition was related to the accident. However, defendants argue, LaBella testified that another chiropractor had told her long before the collision with Ortiz that one of her shoulders was higher than the other, yet she did not discuss this fact with Dr. Kasegian. Therefore, defendants maintain, the trial justice overlooked the fact that Dr. Kasegian lacked information that was crucial to an informed and accurate assessment of the causal connection between the accident and LaBella's complaints.

On cross-examination, Dr. Kasegian acknowledged that she uses a standard form to get a medical history from every new patient. Although the form that LaBella filled out indicates that she had a history of chiropractic care, Dr. Kasegian did not follow up on that history because she recalled LaBella stating that "it wasn't anything substantial." The form also indicates that LaBella never "had any complaints in the involved area be-fore." LaBella's testimony revealed, however, that from June 1994 to March 1995, while she and her family lived in Florida, another chiropractor, Dr. Burns, had treated her neck and back. Doctor Burns told her that one of her shoulders was lower than the other. LaBella also testified that in January 1996 she began to see yet another chiropractor, Dr. Leavitt, for neck pain. Her treatment with Dr. Leavitt lasted until March 1996, at which time her treatment stopped because she had no more neck pain. She also testified that between March 1996 and the accident with Ortiz in December 1996, she had no physical problems or neck pain.

Doctor Kasegian testified on cross-examination that if she had known that LaBella had been treated for a high left shoulder and neck pain with her two previous chiropractors, she might have changed LaBella's prognosis, but "[p]robably not the diagnosis." While ruling on the new-trial motion, the trial justice stated that Dr. Kasegian "did indicate that there was [*sic*] some issues here that she was not made aware of by Mrs. LaBella * * * related to prior chiropractic treatment given by other doctors." However, the trial justice apparently discounted this evidence, pointing to LaBella's testimony that when she had completed her treatments with the two other chiropractors, prior to the accident with defendant, she was symptom free. Moreover, we note Dr. Kasegian's testimony that her diagnosis likely would not have changed had she

---

1. The defendants' pre-briefing memorandum raises the following arguments: (1) Dr. Kasegian was impeached on cross-examination and the issues brought out at that time were more than sufficient to discredit her testimony, thereby providing a sufficient basis for reasonable minds to reach different conclusions; (2) the trial justice overlooked discrepancies between the Harvard Health report and Dr. Kasegian's initial report; (3) the trial justice misconceived evidence about Kyle's condition; (4) the trial justice overlooked inconsistencies between Dr. Kasegian's reports of Katlyn's condition and the treatment she administered to her; (5) the trial justice misconceived evidence concerning Ortiz's testimony; (6) the trial justice overlooked inconsistencies in LaBella's testimony, which cast doubt on her credibility as a witness; and (7) the trial justice either "did not hear or take into account" any testimony that did not support plaintiffs' case.

been made aware of LaBella's treatment for a shoulder height difference. Therefore, the trial justice did not ignore this evidence; rather, he determined that it was insufficient to impeach the credibility of Dr. Kasegian's testimony.

The defendants also argue that the trial justice overlooked discrepancies between the Harvard Health report, which stated that LaBella appeared comfortable and in no acute distress on the Monday after the accident, and Dr. Kasegian's initial report, which, three days after the Harvard Health report, found that LaBella had limited range of motion and a spasm in her neck and upper back. While the Harvard Health report does indicate that LaBella appeared "comfortable" and "in no acute distress," it also indicates that the area where LaBella complained of pain was "tender to palpation and it is reproducible" when that area is touched. LaBella testified that the Harvard Health doctor told her that she "had a classic case of whiplash," and that "it was just a strain" and not a fracture. This doctor's diagnosis does not differ significantly from Dr. Kasegian's opinion that Mrs. LaBella was suffering from "an acute cervical and acute thoracic sprain/strain." Rather than overlooking this evidence, the trial justice commented that "[t]he medical testimony was all one way," and that defense counsel "did not discredit Dr. Kasegian to such an extent that all of her testimony can be completely disregarded by this jury."

The defendants' argument based on alleged inconsistencies in Dr. Kasegian's testimony about Katlyn's ability to move her neck in the days following the accident is not supported by the evidence. Our review of the record does not indicate a major inconsistency in the doctor's testimony concerning her perception of Katlyn's injuries. Doctor Kasegian's testimony confirms that she had been informed

that Katlyn had "trouble moving because of pain" and that by the time she saw Katlyn, she suffered from an "inability to move" to a certain degree. Doctor Kasegian then clarified that with respect to Katlyn, "not moving" meant that she was "very guarded" in her movements and that Katlyn was "rotating just at the shoulders and neck like they're one area."

■ The defendants' assertion that the trial justice misconceived evidence concerning Ortiz's testimony is likewise meritless. Despite the trial justice's finding that there were "some credibility issues" regarding Ortiz's testimony as to how the accident happened and the force of the impact, they contend that there was no significant discrepancy between LaBella's testimony and Ortiz's testimony. We are satisfied that the testimony of these two witnesses is not in the harmonious posture that defendants contend. LaBella testified that she was aware of her truck's condition before the accident and that there had been no prior damage to the rear bumper area. After the accident, she noticed that the right side of her truck's bumper had been "pushed under the bed." She said that the damage shown on the photograph exhibits taken after the accident was not present before the accident and none of that damage occurred after the accident. Ortiz, on the other hand, testified that he had looked at the LaBella vehicle after the accident and saw no damage to it. He stated that he was "positive" that the photographs of the LaBella vehicle did not depict the vehicle as it appeared to him after the accident.

The trial justice remarked that he saw "the evidence and the damage done to that bumper," and that he "didn't hear any contradictory testimony that all of that damage that was done to the bumper was caused by this impact." He also noted that

"in the brief time that [Ortiz] did testify there were certainly some credibility issues with respect to his testimony as to how the accident happened, how strong the impact was and whether or not Mrs. LaBella was already in the intersection or whether he hit her hard enough to drive her into the intersection."

It is clear that there was a credibility issue on the force of the impact. The trial justice determined that Ortiz's testimony was the less credible and accepted the plaintiffs' evidence.

██ The defendants further submit that the trial justice overlooked evidence that the damage to LaBella's truck may not have been caused by the collision with Ortiz. We note initially that the trial justice earlier had indicated that he did not find Ortiz's testimony entirely credible as to the severity of the impact. The trial justice admonished defense counsel that she should have presented an expert witness to dispute plaintiffs' contention that this collision caused the bumper damage, which demonstrates to this Court that rather than overlooking Ortiz's testimony regarding the force of the impact, the trial justice chose not to give it any weight.[2] "[A] trial justice may not be said to have overlooked testimony to which he did not refer if, by pointing to the conflicting testimony on which he relies, his rejection of the other is clearly indicated." *Blecha v. Wells Fargo Guard–Company Service,* 610 A.2d 98, 102–03 (R.I.1992) (quoting *Turgeon v. Davis,* 120 R.I. 586, 592, 388 A.2d 1172, 1175 (1978)).

The trial justice in this case commented on the evidence of the damaged bumper and determined that the impact that LaBella described caused that damage. The trial justice's rejection of Ortiz's testimony about the impact is suggested in his reliance on the evidence showing the bumper damage. We note also the trial justice's reliance on plaintiffs' medical evidence, which was not disputed other than on Dr. Kasegian's cross-examination. Viewing all the evidence in its entirety, the trial justice concluded that Dr. Kasegian found objective symptoms of injury to plaintiffs, that defendants failed to discredit her testimony to the extent that the jury could disregard it, that there was no medical testimony in favor of defendants' position, and that there was damage to plaintiffs' vehicle which evidenced a substantial impact.

██ The trial justice summarized the material evidence and stated that he did not find Ortiz, the defense's only witness, fully credible. He largely accepted Dr. Kasegian's testimony. Because he found that the jury's verdict failed to do substantial justice between the parties, he rejected that verdict, and he substituted it with his own conclusion that the weight of the evidence demonstrated that the collision for which Ortiz was at fault caused plaintiffs' injuries. He duly reviewed the evidence, assessed the witnesses' credibility, and referred to undisputed evidence in the record sufficient to show damages. The trial justice was "shocked" that the jury did not award damages to plaintiffs, determining that the verdict was against the preponderance of the evidence. The trial justice performed his function as "superjuror" and

2.  The trial justice observed:

    "But I did see the evidence and the damage done to that bumper. I didn't hear any contradictory testimony that all of that damage that was done to the bumper was caused by this impact and no attorney is an expert, can argue to a jury that this impact is so mild and that this damage couldn't have been caused. If you want to argue, [defendants' attorney] Mrs. McSweeney, you've got to bring in experts to testify. You've got to bring in experts to testify that that couldn't have been caused by this type of collision."

applied the appropriate standard. Because the trial justice applied the required evidential scrutiny, and because defendants have not shown that he overlooked or misconceived material evidence or was otherwise clearly wrong, we will not disturb the trial justice's decision to grant plaintiffs' motion for a new trial.

The plaintiffs have filed a cross-appeal, arguing that the trial justice erred in refusing to instruct the jury on the issue of aggravation of a preexisting medical condition. However, because this Court has concluded that the trial justice's decision granting the plaintiffs' new-trial motion on other grounds is correct, we need not address this issue.

For the reasons stated above, the trial justice's decision to grant the plaintiffs' motion for a new trial is affirmed. The papers in this case are remanded to the Superior Court.