DECISION
Pursuant to Rule 56 of the Superior Court Rules of Civil Procedure, this matter comes before the Court on a motion for partial summary judgment filed by Plaintiff Christine Coleman ("Plaintiff"). Plaintiff's motion seeks an order striking four of the affirmative defenses asserted by Defendant Rhode Island Airport Corporation ("RIAC"). The subject defenses relate to RIAC's claims of entitlements to certain immunities as well as limits on liability.[1] Furthermore, Plaintiff seeks a declaration that RIAC is not a state agency entitled to immunity from suit, or in the alternative that the General Assembly's grant to RIAC of the capacity to "sue and be sued" is a waiver of any governmental immunities or statutory damage caps that RIAC may have otherwise been afforded. Additionally, Plaintiff would have this Court declare that the operation of Westerly State Airport, specifically the clearing of trees around the runway, is proprietary in nature and therefore RIAC would not be entitled to any immunities or damage caps. RIAC has filed a timely objection to Plaintiff's motion and a cross-motion for partial summary judgment. In its motion, RIAC requests an order holding that the public duty doctrine is available as a complete defense and that the damages cap of the Rhode Island Tort Claims Act is applicable to this action and limits any recoverable damages to $100,000.
 Facts and Travel
On November 16, 2003, Plaintiff's Decedent, Peter Coleman ("Coleman"), along with Hardy Lebel ("Lebel"), was operating a Cessna 180, FAA Registration N34AG, Aircraft Serial Number N32561 ("Cessna"). Coleman and Lebel were practicing take-off and landing procedures at the Westerly State Airport, which is operated by RIAC. Lebel owned the Cessna and kept the plane at the Westerly State Airport pursuant to a monthly use agreement. Both Coleman and Lebel had decades of flying experience including time spent in the employment of New England Aviation, Inc. as commercial pilots.
Also on November 16, 2003, Brooks Kay ("Kay"), who held a single-engine land airplane rating, rented a Piper PA-28-181, FAA Registration N2885D ("Piper") from Windham Aviation, Inc. On such date, Kay took off from Windham Airport in Connecticut with the intent to land at Westerly State Airport. Upon reaching Westerly State Airport, Kay made an initial attempt to land on Runway 32. Kay however, determined that he was too high on his final approach and as a result was forced to abort the landing. Kay then made a second final approach in order to land the Piper on Runway 32. At this time, Kay observed the Cessna about to get on Runway 32. According to Kay, he thought the Cessna would remain on the displaced threshold portion of the runway until after he landed the Piper. For this reason, Kay continued his approach and attempted to land on Runway 32. However, the Cessna did not remain on the displaced threshold, and the Piper and Cessna collided as the Cessna attempted to take off from Runway 32. The force of the collision caused the Cessna to turn perpendicular to the runway and impact the ground. Both Coleman and Lebel suffered fatal injuries. Despite the severity of the collision, Kay managed to ground the Piper. Kay and his two passengers were uninjured.
As a result of the fatal collision between the Cessna and the Piper, Plaintiff filed the underlying wrongful death action. In this action, Plaintiff alleges that RIAC negligently contributed to the fatal accident by failing either to clear the trees, which obstructed visibility at Westerly State Airport, or to close the subject runway in whole or part.
 Standard of Review
"Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, no material questions of fact exist and the moving party is entitled to judgment as a matter of law." Konar v. PFL Life Ins. Co.,840 A.2d 1115, 1117 (R.I. 2004). Furthermore, "a litigant opposing a motion for summary judgment has the burden of proving by competent evidence the existence of a disputed issue of material fact and cannot rest upon mere allegations or denials in the pleadings, mere conclusions or mere legal opinions." Tanner v.The Town Council of East Greenwich et al., 880 A.2d 784, 791
(R.I. 2005) (quoting Lucier v. Impact Recreation, Ltd.,864 A.2d 635, 638 (R.I. 2005)).
In support of her motion, Plaintiff claims that RIAC should be precluded from asserting affirmative defenses relating to common law or statutory immunity because RIAC is not a state agency or alternatively, because RIAC has already waived such immunities. Furthermore, Plaintiff contends that the operation of an airport is not the type of act that is afforded protection under the public duty doctrine or allowed to benefit from the damages cap of the Rhode Island Tort Claims Act. In opposition, RIAC asserts that it is a state agency entitled to claim all governmental immunities, including the public duty doctrine. RIAC also maintains that none of these immunities has been waived. RIAC additionally claims that if it is found subject to liability that any damages should be capped at $100,000 in accordance with terms of the Rhode Island Tort Claims Act.
This Court must first determine whether RIAC is indeed a state agency and, therefore, entitled to claim immunity under the public duty doctrine and avail itself of the statutory damages cap. If RIAC is found to be a state agency, this Court must next decide whether RIAC's ability to "sue and be sued" has effectively waived immunity under the public duty doctrine or placed RIAC outside the ambit of the damages cap. If there has been no such waiver, this Court must then determine whether the act of running an airport is proprietary in nature and therefore not protected under the public duty doctrine and not subject to limited liability under the Rhode Island Tort Claims Act. For the reasons set forth herein, this Court grants partial summary judgment in part for the Plaintiff and in part for Defendant RIAC.
 RIAC's Status
For the purpose of these cross-motions, this Court has been asked to decide whether RIAC should be characterized as a state agency. The purpose of this inquiry is two-fold. First, if RIAC is in reality a state agency, then RIAC would be able to claim immunity under the common law doctrine of public duty, which "shields a governmental entity from liability only when that entity engages in activity that an individual ordinarily would not perform." Tedesco v. Connors, 871 A.2d 920, 924 (R.I. 2005) (citing Martinelli v. Hopkins, 787 A.2d 1158, 1167 (R.I. 2001)). Secondly, if RIAC is a state agency, it would be subject to tort liability "in the same manner as a private individual or corporation" under the Rhode Island Tort Claims Act. G.L. 1956 §9-31-1. Under this act, liability is subject to certain monetary limitations so long as the tortious act complained of was not committed while the state agency was engaged in a proprietary function. Sec. 9-31-2.
In 1974, the General Assembly created the Rhode Island Port Authority and Economic Development Corporation ("EDC"). G.L. 1956 § 42-64-4. The General Assembly authorized the EDC to "exercise and perform its powers and functions" through subsidiary corporations that the EDC could create with the approval of the General Assembly. Sec. 42-64-7.1. Pursuant to this authority, the EDC created RIAC to operate and manage Rhode Island's airport system.
In 1993, the Rhode Island Supreme Court was asked by the Governor to determine whether the leasing of certain land and fixtures to RIAC and the delegation of the authority to run the state's airports to RIAC ran afoul of the Rhode Island Constitution and state statutory scheme. In re Advisory Opinionto the Governor (Rhode Island Airport Corporation),627 A.2d 1246 (R.I. 1993). The Supreme Court held that the transfers were proper and that RIAC did possess the authority to operate and manage the airport system. In a well-reasoned opinion, our Supreme Court reached these conclusions, in part, by determining that RIAC did qualify as a governmental or state agency. The Supreme Court held that RIAC had the statutory authority to become lessee and transferee of the land and fixtures:
 "RIAC is `another department, board, bureau, commission, or agency of the state government.' [as required for the transfer to be effective under G.L. 1956 § 37-7-6]. As a subsidiary of RIPA [Rhode Island Port Authority and Economic Development Corporation], RIAC possesses all the `powers, privileges, [and] rights' of RIPA. Section 42-64-7.1(b). The General Assembly has expressly stated that RIPA is a `governmental agency.' Section 42-64-4(a). Since RIAC holds the same rights and is subject to the same limitations as RIPA, RIAC is also a `governmental agency.' RIAC therefore qualifies as a state agency authorized to accept the transfer of property from the DOT." Id. at 1249.
The Supreme Court employed the same reasoning to determine that RIAC was a proper state agency for the Department of Transportation to delegate the authority to to run the state's airports. Furthermore, in deciding on the constitutionality of the delegation to RIAC, the Supreme Court stated that:
 "We do not believe, however, that the delegation of managerial and regulatory power to RIPA and its subsidiary, RIAC, would violate this constitutional doctrine because these agencies are not private entities. . . . . . although RIAC certainly has some distinct corporate attributes, it is primarily public in nature so as to withstand a constitutional challenge on the ground that the General Assembly unconstitutionally delegated governmental authority to a private entity." Id. at 1253.
The issue before this Court is thus not one of first impression. The Supreme Court's reasoning in In re AdvisoryOpinion to the Governor is persuasive and its holding is controlling. This Court therefore finds that RIAC is not a private entity, but rather a state agency. It is thus held that RIAC, because of its status as a state agency, is entitled to claim immunity under the public duty doctrine. It is further held that as a state agency RIAC is subject to tort liability under the Rhode Island Tort Claims Act. By virtue of this fact, RIAC will be entitled to the damages limitation of § 9-31-2, so long as the act complained of is not proprietary in nature.
 Waiver
Plaintiff, in her motion, advances a second argument in which it was assumed in arguendo that RIAC is a state agency. As this Court has found, for the above-stated reasons, that RIAC is a state agency, it will now address Plaintiff's second argument. Plaintiff claims that the General Assembly's grant to RIAC of the ability to "sue and be sued" waives RIAC's entitlement to (1) sovereign immunity; (2) immunity under the public duty doctrine; and (3) the right to claim the statutory damages cap of § 9-31-2. RIAC has since conceded, and this Court agrees, that sovereign immunity does not apply to RIAC under these circumstances. It is therefore only necessary to address Plaintiff's second and third contentions.
Section 42-64-6 of the General Laws gives the EDC the power "[t]o sue and be sued, complain and defend, in its corporate name." Under § 42-64-7.1, the subsidiaries of the EDC, including RIAC, are given "all the powers, privileges, rights, immunities, tax exemptions, and other exemptions of the parent corporation." Sec. 42-64-7.1. This grant is subject to certain limitations, which are not relevant to this case. Based on this Court's reading of these general laws, it is clear that the General Assembly has bestowed upon RIAC the power to "sue and be sued." However, for the reasons set forth in this section, this Court is not of the opinion that the ability to "sue and be sued" is a waiver of the public duty doctrine or that it somehow places RIAC outside the scope of the Rhode Island Tort Claims Act, including the damages cap of § 9-31-2.
A. The Public Duty Doctrine
This Court first considers whether the "sue and be sued" language of § 42-64-6 has any effect on the ability of RIAC to claim immunity under the public duty doctrine. The Supreme Court has recently had the opportunity to consider whether it is possible for the language of a statute to waive the common law right to immunity under the public duty doctrine. In Torres v.Damicis, the Supreme Court considered whether G.L. 1956 §5-65-3, which conditions the issuance of building permits on the fulfilling of certain requirements, waived the Town of Richmond's right to immunity under the public duty doctrine. Torres v.Damicis, 853 A.2d 1233, 1237 (R.I. 2004). The Supreme Court concluded that the defendant town had not waived its right to immunity under the public duty doctrine, finding that "[w]e detect nothing in the statute that explicitly waives a municipality's immunity for failing to ascertain a contractor's registration number." Id. at 1238. The Supreme Court revisited this issue in Seide v. State, wherein they were asked to resolve whether § 31-12-9, which requires due care by emergency vehicles, constituted a legislative waiver of immunity under the public duty doctrine. Seide v. State, 875 A.2d 1259 (R.I. 2005). In that case, the Court found that the public duty doctrine defense was waived by the state as, "[u]nquestionably, §31-12-9 is an express waiver of an officer's immunity from suit because it provides that the driver of an emergency vehicle is not protected `from the consequences of [his or her] reckless disregard for the safety of others.'" Seide v. State,875 A.2d at 1268.
While the Supreme Court reached differing results in these two cases, it did so by utilizing the same logic. This Court therefore applies this same analysis to the facts at hand. In deciding whether the legislature intended to waive immunity, the Supreme Court stated that "[i]n passing upon claimed immunity arising from an act of the General Assembly or the Public Duty Doctrine, we presume that `the Legislature did not intend to deprive the state of any sovereign power `unless the intent to do so is clearly expressed or arises by necessary implication from the statutory language.''" Seide v. State, 875 A.2d at 1268
(quoting Torres v. Damicis, 853 A.2d at 1237). The Court further found that "[w]hen ascertaining whether a waiver of sovereign immunity exists in a statute, `the language of the statute must be closely parsed and strictly construed.'" Seidev. State, 875 A.2d at 1268. Based on this test of strict statutory construction, this Court does not believe that the "sued and be sued" language of § 42-64-6 clearly evidences an intent by the Legislature to waive any and all governmental immunity defenses that could be raised by the EDC or its subsidiaries, most significantly RIAC. It is more likely that §42-64-6, read in conjunction with § 42-64-7.1, was intended as an initial procedural grant under which a plaintiff could bring suit against RIAC. Therefore, in the absence of a clear legislative objective to abrogate RIAC's entitlement to governmental immunities, this Court finds that RIAC is permitted to claim the public duty doctrine as an affirmative defense.
B. Rhode Island Tort Claims Act
The Court now considers Plaintiff's claim that the "sue and be sued" language of § 42-64-6 causes the Rhode Island Tort Claims Act to be inapposite, and most significantly, renders RIAC unable to claim the damages cap. Plaintiff asserts that her claim is not subject to the $100,000 damages cap because she is pursuing this cause of action under the theory that RIAC's sovereign immunity was waived by the "sue and be sued" language of § 42-64-6 and not by the waiver of sovereign immunity that Rhode Island courts have long recognized occurred with the enactment of § 9-31-1 of the Rhode Island Tort Claims Act.
Courts have continually found that "[t]he Rhode Island Tort Claims Act . . . is a statutory waiver of both state and municipal sovereign immunity. The act `permits individuals to sue governmental units in the same manner as private individuals.'"Seide v. State, 875 A.2d at 1267 (quoting Catone v. Medberry,555 A.2d 328, 330 (R.I. 1989)). This Court does not believe that Plaintiff can avoid the statutory damages cap of § 9-31-2 by claiming to proceed solely under a waiver of sovereign immunity effectuated by the "sue and be sued" language of § 42-64-6. This argument is without merit and does not serve to change the fact that any tort action against a state agency falls within the scope of the Rhode Island Tort Claims Act. The unambiguous language of the Rhode Island Tort Claims Act states that the $100,000 damages cap applies to "any tort action against the state of Rhode Island or any political subdivision." Sec. 9-31-2
(emphasis added).[2] Based on this explicit pronouncement, it is clear that Plaintiff's wrongful death action against RIAC, a state agency, is subject to the $100,000 damages cap, unless it is determined by this Court that the "proprietary function" exception to the damages cap applies.
This Court further finds it noteworthy that towns and cities, similar to RIAC, have been granted the power to "sue and be sued" by statute. G.L. 1956 § 45-15-1 states that "[t]he inhabitants of every town shall continue to be a body corporate, and may, in their corporate name, sue and be sued, prosecute and defend, in any court and elsewhere." The Rhode Island Tort Claims Act also applies to cities and towns, capping their damages at $100,000. Section 9-31-3 states "[i]n any tort action against any city or town or any fire district, any damages recovered therein shall not exceed the sum of one hundred thousand dollars." Notably, Rhode Island courts have not read the "sue and be sued" language of § 45-15-1 to place cities and towns outside the ambit of the Tort Claims Act and thus not entitled to the damages cap of §9-31-3. See L.A. Realty v. The Town Council of Cumberland,698 A.2d 202 (1997) (holding that the town of Cumberland's damages for tortious interference with a contract were limited by § 9-31-3); see also DiCenzo v. Ruscetta, 510 A.2d 417 (R.I. 1986) (applying § 9-31-3's damages cap to a judgment against the city of Cranston). This Court's reasoning is consistent with these holdings.
 Operation of the Airport
For final consideration, in these cross-motions for summary judgment, is the nature of RIAC's operation of the Westerly State Airport. This determination is of dual importance. First, although this Court has held that RIAC is entitled to claim immunity under the public duty doctrine, the doctrine does not afford protection unless the accused entity was, at the time of the alleged tortious conduct, engaged in an "activity that an individual ordinarily would not perform." Tedesco v. Connors,871 A.2d 920, 924 (R.I. 2005). If the operation of the Westerly State Airport does not qualify under this standard, then RIAC will not be entitled to immunity under the public duty doctrine. Secondly, the damages cap of the Rhode Island Tort Claims Act does not apply in instances where the charged state entity was engaged in "a proprietary function" during the commission of the alleged tort. Sec. 9-31-2. As a result, if the operation of the Westerly State Airport is proprietary, then any liability that RIAC may eventually be subject to will not be limited by the statutory damages cap.
A. The Public Duty Doctrine
The Rhode Island Supreme Court has held that an analysis under the public duty doctrine requires two steps. "First, a court must determine whether the public duty doctrine applies to the facts of the case. The doctrine shields a governmental entity from liability only when that entity engages in activity that an individual ordinarily would not perform." Tedesco v. Connors,871 A.2d at 924 (citing Martinelli v. Hopkins, 787 A.2d 1158,1167 (R.I. 2001) "The second step in this inquiry requires the court to focus on the applicability of the two exceptions to the public duty doctrine: `(1) when the governmental entity owes a `special duty' to the plaintiff, (2) when the alleged act or omission on the part of the governmental entity [is] egregious.'"Tedesco v. Connors, 871 A.2d at 924. Therefore, it is "only after a determination that the activity at issue `could not ordinarily be performed by a private person' does the public-duty doctrine and its two exceptions — the special-duty exception and the egregious-conduct exception — become considerations."Martinelli v. Hopkins, 787 A.2d at 1167 (quoting Haley v. Townof Lincoln, 611 A.2d 845, 849 (R.I. 1992)). Thus, for this present inquiry, it is only necessary for this Court to complete the first step of the analysis and determine whether the public duty doctrine applies to the facts of this case.
Rhode Island courts have previously expressed the rationale behind a protective tenet, such as the public duty doctrine. "The underlying purpose of the public-duty doctrine `is to encourage the effective administration of governmental operations by removing the threat of potential litigation.'" Martinelli v.Hopkins, 787 A.2d at 1167 (quoting Catone v. Medberry,555 A.2d at 333). Courts have been able to realize this end by allowing "Rhode Island government entities [to] enjoy immunity from tort liability arising out of their discretionary governmental actions that by their nature are not ordinarily performed by private persons." Chakuroff v. Boyle,667 A.2d 1256, 1258 (R.I. 1995). The Rhode Island Supreme Court further explained that "[i]n every case in which we have applied the public duty doctrine, the government or its agent was engaged in an activity inherently incapable of being performed by private individuals . . . [n]o reasonable basis exists for applying the public duty doctrine to situations in which the government acts in a manner similar to a private individual or corporation."Catone v. Medberry, 555 A.2d at 333.
For these reasons, it is clear that the public duty doctrine is not intended, and by no means would it advance its doctrinal purpose, to protect governmental entities that are not performing discretionary governmental functions but rather are performing an act that could be carried out by private individuals or corporations. Based on these requirements, this Court does not find that RIAC's operation of the Westerly State Airport, nor any tortious conduct that may be found to have arisen from this operation, should be protected under the public duty doctrine. The Westerly State Airport is clearly a public use airport operated by RIAC, a state agency. However the state agency here was not "engaged in an activity inherently incapable of being performed by private individuals." Catone v. Medberry,555 A.2d at 333. Rather the converse is true. Public airports in the United States, not only can be, but are privately owned and operated.
RIAC, in its motion, relies heavily on Custom Flight Systemsof New England v. State to support its proposition that running a public airport is exclusively a public function. In CustomFlight Systems of New England v. State, the Supreme Court held that the state was immunized under the public duty doctrine from liability for an incident that arose during their operation of the Block Island Airport. The Court held that the "private individual" public duty exception did not apply because "running a public airport is exclusively an activity performed by a public entity." Custom Flight Systems of New England v. State,641 A.2d 1324, 1324 (R.I. 1994). RIAC's reliance on this statement is misplaced, however. In July of 2006, there were 5261 public airports operating in the United States.[3] Of these 5261 public airports, 1092 were privately owned.[4] Furthermore in 1995, one year after Custom Flight Systems of New England v.State was decided; there were 1243 public airports that were privately owned in the United States.[5] These statistics demonstrate that the operation of a public airport, such as the Westerly State Airport, is clearly not an activity that is incapable of being performed by private individuals or corporations. For this reason, there exists no rational basis for cloaking RIAC with immunity under the public duty doctrine.
In addition, this Court further notes the extent to which RIAC's operations are akin to those of a private company. RIAC is a self-sustaining entity, which receives no monetary support from the State's General Fund.[6] In 2005, RIAC's operations of Rhode Island's airport system produced a total net income of $6,036,846.[7] Further noteworthy is the fact that RIAC contracts with an airport manager, Piedmont Hawthorne Aviation, Incorporated, to manage its five general aviation airports, including Westerly State Airport.[8] Piedmont Hawthorne Aviation is required to maintain airport operation liability insurance in the amount of $10,000,000, under which RIAC is named as an additional insured.[9] Moreover, RIAC is itself insured by one or more insuring agreements under which an insurer may be liable to satisfy part or all of any judgment which may be entered into this action.[10]
Based on the above, this Court finds that the public duty doctrine does not apply to the facts of this case. As a result RIAC is not entitled to immunity under the doctrine.
B. Rhode Island Tort Claims Act
For final determination is whether the damages cap of § 9-31-2
should serve to limit RIAC's liability, if any should be found. Section 9-31-2 of the Rhode Island Tort Claims Act states that:
 "In any tort action against the state of Rhode Island or any political subdivision thereof, any damages recovered therein shall not exceed the sum of one hundred thousand dollars ($100,000); provided, however, that in all instances in which the state was engaged in a proprietary function in the commission of the tort. . . . the limitation on damages set forth in this section shall not apply." Sec. 9-31-2.
The Supreme Court has held that "a proprietary function is one which is not `so intertwined with governing that the government is obligated to perform it only by its own agents or employees.'"Lepore v. Rhode Island Public Transit Authority, 524 A.2d 574,575 (R.I. 1987) (quoting Xavier v. Cianci, 479 A.2d 1179, 1182
(R.I. 1984)). The appropriate inquiry is "whether the activity [at issue] was one that a private person or corporation would be likely to carry out." DeLong v. Prudential Property and CasualtyInsurance Co., 583 A.2d 75, 76 (R.I. 1990). This Court finds that the function at issue here, that is the operation of the Westerly State Airport, is proprietary in nature.
In Lepore v. Rhode Island Public Transit Authority, the Supreme Court found that the defendant, Rhode Island Public Transit Authority (RIPTA), was engaged in a proprietary function in operating Rhode Island's public transportation system. Like RIAC, RIPTA was providing a service for travelers who desired to journey from their point of origin to another location. Our Supreme Court held that because RIPTA was engaged in a proprietary function, the damages cap of § 9-31-2 did not apply to limit RIPTA's liability for the complained of personal injury action. The Court found it significant that RIPTA, a state entity, originally purchased its bus line from a private company.[11] The Court stated that:
 "In light of RIPTA's history it seems clear that the authority's activities could easily be performed by a private-business corporation. Therefore, we do not believe that maintaining a public-transportation authority is a function that is so intertwined with governing that we will consider it a governmental function. Rather, we consider its operation proprietary in nature." Lepore v. Rhode Island Public Transit Authority, 524 A.2d at 575.
While the facts before this Court may not be completely analogous to those of Lepore, the Supreme Court's reasoning is applicable. In light of the above information, respecting the number of privately owned public airports, it is apparent that the operation of a public airport is not only an activity that "could easily be performed by a private-business corporation" but in fact it is such an activity. Lepore v. Rhode IslandPublic Transit Authority, 524 A.2d at 575 (emphasis added). Notable here is the fact that within the State of Rhode Island, the Richmond Airport is privately owned and open to the public.
Furthermore, this Court does not find that the operation of a public airport is one which the government is "obligated to perform . . . only by its own agents or employees." Lepore v.Rhode Island Public Transit Authority, 524 A.2d at 575. As stated above, the daily operation, management and maintenance of the Westerly State Airport is carried out by Piedmont Hawthorne Aviation, Inc., not RIAC. This type of situation is not unique to Westerly State Airport. In 1996, ninety percent of those persons working at sixty-nine of the largest publicly owned airports in the United States were employed by private companies.[12]
Only ten percent of the employees were local and state governmental personnel, federal employees or military personnel.[13] Today U.S. airports are relying more heavily than ever before on "the private sector for airport operations and financing" and this fact has caused these airports "to adopt more business like practices."[14] Further noteworthy is the recent trend toward the privatization of public airports in the U.S. and abroad. In 1997, Congress established the Airport Privatization Pilot Program, in order to explore whether privatization could produce alternative sources of capital for airport development and operation.[15] The Federal Aviation Administration ("FAA") is authorized to permit up to five public airports to participate in the program by exempting the airports from certain Federal requirements.[16] To date, Stewart International Airport in New York is the only airport granted an exemption under this program; however, two other airports, including Chicago Midway International Airport, have applications pending. The privatization movement has gained even more ground outside of the United States. In 1987, the United Kingdom privatized its seven major airports, including London's Heathrow, by selling the government corporation British Airports Authority in a $2.5 billion dollar public share offering.[17] Since this time, other countries have completed a private sale or lease of airport facilities including Australia, Canada, China, Germany, Italy, Japan, Mexico, New Zealand, and South Africa.[18]
In light of the private sector's influence on publicly owned airports and the fact that there are privately owned public use airports, this Court is persuaded that the operation of Westerly State Airport is proprietary and not governmental. This Court is cognizant of the fact that all public airports, whether publicly or privately owned, have to comply with federal aviation law. Our government, through the FAA and the Department of Transportation, does exercise its police power over the aviation industry in order to promote safety, welfare and uniformity. Undoubtedly, the exercise of this power, through the creation of requirements and regulations, such as runway or airplane safety standards, is a governmental function. This Court does not, however, consider it therefore logical to conclude that the actual daily operation of an airport, in accord with these universal obligations, is governmental. The implementation of these governmental requirements and regulations is the responsibility of any entity that offers aviation services in this country.
In light of the above, this Court finds that RIAC was engaged in a proprietary function in its operation of the Westerly State Airport, and as a result, the damages cap of § 9-31-2 does not apply to limit its liability, should any later be found.
C. Tree Clearing
Due to the fact that this Court has determined that RIAC's operation of the Westerly State Airport does not qualify for immunity under the public duty doctrine and is not subject to the damages cap of § 9-31-2, there is no need to determine the narrower issue of whether the actual act of clearing trees around an airport is a governmental function. However, this Court would like to briefly visit this matter. In Scenic Rhode Island Inc.,David Dunn v. Rhode Island Department of Transportation, the Rhode Island Superior Court considered whether the Department of Transportation was entitled to immunity under the public duty doctrine for the removal of certain hazardous trees and growth around the Newport State Airport. The Court held that the state was immune from liability under the public duty doctrine because the clearing of trees pursuant to FAA regulations was not "such a task normally performed by a private citizen in the ordinary course of events." Scenic Rhode Island Inc., David Dunn v. RhodeIsland Department of Transportation, 1991 R.I. Super. LEXIS 171, *9 (1991). In its motion, RIAC relies heavily on this decision in order to support its contention that tree clearing, pursuant to FAA regulations, is exclusively a governmental function. However,Scenic Rhode Island Inc. is not binding on this Court and further, this Court respectfully disagrees with its holding, in so much as it addresses the nature of the act of tree clearing.
As discussed above, it is clear that all airports are required to comply with federal aviation law, whether those airports are publicly or privately owned. FAA regulations define the term "airport" as "an area of land or water that is used or intended to be used for the landing and takeoff of aircraft, and includes its buildings and facilities, if any." 14 C.F.R. § 1.1. This definition makes no differentiation between airports that are publicly or privately owned. Additionally, FAA regulations addressing the very issue at hand, as well as the issue inScenic Rhode Island Inc. — objects, such as trees, affecting navigable airspace — does not draw a distinction between airports that are publicly or privately owned. Specifically, the regulation defines a public use airport as "an airport that is open to the general public with or without a prior request to use the airport." 14 C.F.R. § 77.2. The ownership of the airport bears no relation to the airport's obligation to comply with FAA standards or to notify the FAA of any possible hazardous obstructions. In light of the reality that both private and public airports are obliged to comply with FAA regulations that address obstacles to navigable airspace, this Court does not find any validity to RIAC's claim that tree clearing, pursuant to these regulations, is inherently incapable of being performed by a private party and is, therefore, a governmental function.
 Conclusion
After consideration of the parties' oral arguments and their respective memoranda, this Court grants partial summary judgment in part for the Plaintiff and in part for the defendant, RIAC. In ruling for RIAC, this Court finds that (1) RIAC is a state agency; (2) RIAC's power to "sue and be sued" does not waive the public duty doctrine as an affirmative defense; and (3) RIAC's power to "sue and be sued" does not place RIAC outside the scope of the Rhode Island Tort Claims Act and its damages cap. In ruling for the Plaintiff, this Court finds that (1) the operation of the Westerly State Airport is not the type of activity protected under the public duty doctrine and therefore RIAC is not entitled to immunity under the doctrine, and (2) any liability imposed on RIAC will not be subject to the $100,000 damages cap of § 9-31-2 because the operation of the Westerly State Airport is proprietary. Counsel shall submit appropriate orders in accordance with the Court's decision.
[1] See Pl.'s Mem. in Supp. of Mot. for Partial Summ. J. Striking the Affirmative Defenses of Defendant Rhode Island Airport Corporation Concerning Sovereign Immunity: "Second Affirmative Defense; Answering Defendant is a government agency engaged in a governmental function. Third Affirmative Defense; Answering Defendant is immune from suit based on R.I.G.L. §9-31-2. Fourth Affirmative Defense; Answering Defendant is immune from liability above $100,000 based on R.I.G.L. § 9-31-2. Fifth Affirmative Defense; Answering Defendant is immune from suit based on the public duty doctrine and other applicable governmental immunities."
[2] The $100,000 limitation on damages does not, however, apply to instances "in which the state was engaged in a proprietary function in the commission of the tort, or in any situation whereby the state has agreed to indemnify the federal government or any agency thereof for any tort liability" Sec. 9-31-2.
[3] See U.S. Department of Transportation and Federal Aviation Administration, National Plan of Integrated AirportSystems (NPIAS) (2007-2011).
[4] Id.
[5] See United States General Accounting Office, Report to the Subcommittee on Aviation, Committee on Transportation and Infrastructure, House of Representatives, AirportPrivatization, (November 1996).
[6] See Rhode Island Airport Corporation, June 30, 2005 and 2004 Financial Statements, 4 (2005).
[7] Id. at 9.
[8] Id. at 8.
[9] See Management Contract between RIAC and Hawthorne Aviation Incorporated, 7 (May 7, 1996).
[10] See Answer of Rhode Island Airport Corporation to Second Amended Complaint of Christine Coleman, Individually and as Executrix of the Estate of Peter Coleman and as Parent and Next Friend of Stephen Coleman and Cross Claim for Contribution Directed to All Defendants, ¶ 9 (December 8, 2004).
[11] It is interesting to note that the Federal government's regulation of civil aviation did not begin until 1926 when the Air Commerce Act was passed. Prior to this time, the aviation industry in this country was primarily privately run and not uniformly regulated.
[12] See U.S.G.A.O., supra, n. 5 at 5.
[13] Id.
[14] Id. at 22.
[15] See 49 U.S.C. § 47134.
[16] See U.S. Department of Transportation Federal Aviation Administration, Report to Congress on the Status of the AirportPrivatization Pilot Program, 2 (August 2004).
[17] See U.S.G.A.O., supra, n. 5 at 30.
[18] See Frost Sullivan, Airport Privatisation (April 25, 2006).